IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2015

**STATE OF TENNESSEE v. CALVIN DOUGLAS**

**Appeal from the Criminal Court for Shelby County**
**No. 12-05135     W. Mark Ward, Judge**

_____
_____

**No. W2014-00505-CCA-R3-CD  -  Filed February 26, 2015**

_____
_____

The Defendant-Appellant, Calvin Douglas, was convicted by a Shelby County Criminal Court jury of three counts of aggravated assault and one count of reckless endangerment with a dangerous weapon. The trial court sentenced the Defendant to an effective sentence of 20 years' confinement. On appeal, the Defendant argues that (1) the evidence is insufficient to sustain his convictions for aggravated assault and reckless endangerment with a deadly weapon, and (2) the trial court abused its discretion in imposing consecutive sentences. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Tony N. Brayton, Assistant District Public Defender (on appeal), and Jim Hale, Assistant District Public Defender (at trial), Memphis, Tennessee for the Defendant-Appellant, Calvin Douglas.

Robert E. Cooper, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Nicole Germain, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On March 7, 2012, several gunshots were fired in an area near the Perkins Grocery Store in Memphis. The Defendant was subsequently implicated in the incident and indicted

for one count of attempted second-degree murder, one count of employing a firearm during a dangerous felony, three counts of aggravated assault, and one count of reckless endangerment with a deadly weapon. Following a jury trial, the Defendant was convicted of three counts of aggravated assault and one count of reckless endangerment with a deadly weapon.

**State's Proof.** Javaris Cole testified that on March 7, 2012, he walked to Perkins Grocery Store with his girlfriend, Tiera Nichols, and Ms. Nichols's sister, Anterrica Stokes. Before entering the store, Javaris[1] heard the Defendant shout, "There go that n***** there" from the backseat of car being driven by the Defendant's sister, Jasmine Douglas. Javaris knew the Defendant from the neighborhood but did not know him personally and had not had any prior altercations with him. As the car drove away, the Defendant stated, "I'll be right back." Javaris followed the car down the street because he "wanted to know what was going on" and saw it stop at a stop sign nearby. The Defendant exited the car to talk to someone, and Javaris approached the car and asked Jasmine what was going on. Javaris then saw the Defendant take off his shirt, run toward the car, and begin fighting the person standing next to Javaris. Javaris attempted to break up the fight, but the Defendant tried to punch Javaris and a fight ensued between them. After several individuals broke up the fight, Javaris saw Ms. Nichols fighting with Jasmine.

Javaris testified that the police arrived and sounded their sirens, and the crowd scattered. The police officers did not speak to anyone before leaving the scene. Javaris, Ms. Nichols, and Ms. Stokes walked back toward the store. Chris Cole, Javaris's brother, approached them in the parking lot of the store and asked what happened. While talking to Chris, Javaris saw the Defendant running in the middle of the street toward him. Javaris saw the Defendant pointing a gun at him but thought the Defendant was shooting in the air because he did not "hear [any] bullet come past [his] ear." Javaris testified that he heard more than six shots. He assisted Ms. Nichols and Ms. Stokes over a gate behind the store to escape the gunfire and then fled to a nearby house. Javaris testified that approximately 10 minutes had passed between the fight and when the Defendant returned to the scene. He was "positive" the Defendant was the shooter.

After fleeing to the nearby house for shelter, Javaris saw Chris chase the Defendant down the street. Chris returned and said that the Defendant had gotten away. The police arrived on the scene, and Javaris told them what happened. He subsequently spoke with Officer Todd Casinghino at the police station and identified the Defendant out of a

---

[1] Several witnesses share the same last name in this case. For clarity, we will refer to these witnesses by their first names. We intend no disrespect in doing so.

photographic lineup as the shooter. On cross-examination, Javaris denied that he initially told police that he was only a witness and that the Defendant did not shoot at him.

Chris Cole testified that on the day of the incident, he walked to Perkins Grocery Store and learned that Javaris had been involved in a fight. He then walked to a friend's house nearby and went inside. After approximately three minutes, Chris heard gunshots coming from the store's direction. Chris returned to the store and saw the shooter, whom he later identified as the Defendant, shooting at someone running down the street. He estimated that the Defendant fired four or five shots. The Defendant then turned toward Chris and attempted to fire several shots at him. Chris heard the gun make a "click, click" noise and realized the clip was empty, so he began to chase the Defendant but was unable to catch him. Chris testified that he was within 10 or 15 feet of the Defendant and was able to get a clear look at him. He stated that the Defendant was the only person he saw with a gun. When the police arrived on the scene, Chris told them what happened and directed them to where he last saw the Defendant. On cross-examination, Chris agreed that he told police he was unable to see the shooter's face.

Vicki Strong testified that on the day of the incident, she stopped by her brother's house to visit him. She parked her car near the Perkins Grocery Store and went inside her brother's garage. A few minutes after entering the garage, she heard multiple gunshots and "got down in the garage" until the shooting ended. She heard about six or seven gunshots but did not see the shooter. After the shooting, someone came into the garage and told Ms. Strong that the windows of her car had been shattered by the gunfire. She reported the damage to the police.

Officer Jacques Pope of the Memphis Police Department ("MPD") testified that he responded to the scene of the shooting near Perkins Grocery Store. When he arrived on the scene, he noticed a car whose front and back windshields had been shattered by gunfire. While he was checking the damage to the car, several individuals approached and told him what happened. Officer Pope secured the scene and spoke with Javaris, Chris, and the owner of the damaged car, Vicki Strong. On cross-examination, Officer Pope stated that his initial report listed Javaris as a witness and that Javaris did not tell him that the Defendant shot at him.

Memphis Police Officer Stacy Milligan responded to the scene of the shooting as part of the Crime Scene Investigation Unit. He collected evidence and took photographs at the scene, which were introduced into evidence and shown to the jury. When he arrived at the scene, he observed "quite a few shell casings," all of which appeared to have been fired from "a semi-automatic handgun." He collected at least 14 shell casings from the scene and

-3-

testified that they were all 9 millimeter Luger shell casings. He opined that they were all fired from the same weapon.

Sergeant Todd Casinghino testified that he assisted in the investigation of the crimes in this case. He took a statement from Javaris and showed him a photographic lineup that included the Defendant. He explained to Javaris the procedures for a photographic lineup and told him that the shooter may or may not be depicted in the lineup. Javaris identified the Defendant in the lineup as the shooter.

Sergeant Derrick Williams testified that a suspect was developed by the scene officers, and a photographic lineup was compiled to show to the victims. After reviewing the statements given by Javaris and Chris Cole and the photographic identification of the Defendant, Sergeant Williams sought a warrant for the Defendant's arrest.

**Defendant's Proof.** The Defendant testified that on the day of the offense, he, Jasmine, and another friend drove by Perkins Grocery Store in Jasmine's car. They stopped the car in front of the store because the road was blocked by two garbage trucks. While they were stopped, Javaris approached the car and attempted to talk to Jasmine. Jasmine rebuffed Javaris's advances, and he began making disrespectful comments to her. The Defendant told Javaris to leave, but Javaris attempted to reach in the car window and "smack" Jasmine. His arm got caught in the window, and he asked Chris to help him break the window. Instead, Chris opened the car door and pulled Jasmine out of the car. The Defendant exited the car to help Jasmine, and about 15 people "jumped" on him and Jasmine and began beating them. When the fight ended, the Defendant and Jasmine left the scene and went to their mother's house.

The Defendant testified that after the fight, he was "[b]lacking out" and angry about the events. He recalled that several police officers and an ambulance came to his mother's house. He also recalled that two women came to his mother's house and told the officers that they wanted to press charges against the Defendant because he hit one of them. The Defendant testified that a police officer tried to "grab [him] but [he] snatched away." His mother then drove him to his godmother's house nearby. He testified that he remained at his godmother's house until an ambulance drove him to the hospital and insisted that he never returned to Perkins Grocery Store after the fight with Javaris and did not shoot at anyone.

Wendy Douglas, the Defendant's mother, recalled that on the morning of the incident, the Defendant and her daughter, Jasmine, left Wendy's house to take her grandchildren to school. When they returned, they appeared "beat up real bad." She testified that the Defendant's face was swollen and he had knots on the back of his head. After learning about the fight, Wendy went to Perkins Grocery Store to find out why the Defendant and Jasmine

-4-

were "jumped on like that." When she returned home, she called an ambulance because the Defendant was "going in and out of conscious[ness]." She recalled that several police officers also came to her house to talk to the Defendant. She testified that the officers "w[ere not] treating [the Defendant] right" so she told them to leave him alone and took him to his godmother's house.

While driving home, she heard gunshots and drove to Perkins Grocery Store to see what happened. At the scene, several individuals told her that the Defendant had returned to the scene, but she did not believe them. She spoke with police officers at the scene and then returned home. After returning home, a police officer came to her house and inquired into the Defendant's whereabouts. Wendy called the Defendant and allowed the officer to speak with him on the phone. He told the officer where he was located, and when police arrived, they tried to arrest him; however, an ambulance transported him to the hospital to receive medical attention instead.

Following deliberation, the jury found the Defendant not guilty of attempted second degree murder and employing a firearm during the commission of a dangerous felony. The jury convicted the Defendant of three counts of aggravated assault and one count of reckless endangerment with a deadly weapon as charged in the indictment. Following a sentencing hearing, the trial court sentenced the Defendant to the maximum of six years for each aggravated assault conviction and two years for the reckless endangerment with a deadly weapon conviction. The court ordered each of the sentences to be served consecutively for an effective sentence of 20 years' confinement.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions for aggravated assault and reckless endangerment with a deadly weapon. He further argues that the trial court abused its discretion in imposing consecutive sentences. The State responds that the evidence is sufficient to support the Defendant's convictions, and the trial court acted within its discretion in sentencing the Defendant to consecutive sentences. Upon our review, we agree with the State.

**I. Sufficiency of the Evidence.** The Defendant first challenges the sufficiency of the evidence supporting his convictions for aggravated assault and reckless endangerment with a deadly weapon. When a defendant challenges the sufficiency of the evidence, we are guided by the following well-established legal principles. The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of

the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence; the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

**A. Aggravated Assault.** In challenging the sufficiency of the evidence supporting his convictions for aggravated assault against Javaris Cole, Chris Cole, and Tiera Nichols, the Defendant contests the proof establishing that he "intentionally and knowingly" caused each victim to reasonably fear imminent bodily injury by the use of or display of a deadly weapon. He argues that the evidence merely established that he fired the gun into the air and failed to prove that he pointed the gun at any victim. Further, he notes that Ms. Nichols did not testify at trial and asserts that there was no proof that the Defendant was aware that she was in the area during the incident; thus, the State failed to prove that he intentionally or knowingly caused her to fear imminent bodily injury.

To sustain the Defendant's convictions in the present case, the State was required to prove that the Defendant intentionally or knowingly caused the victims to reasonably fear imminent bodily injury and used or displayed a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii). A person acts "intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). A person acts "knowingly with respect to

the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Id. § 39‒11‒302(b); see State v. Szumanski Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007) (concluding that the offense of aggravated assault committed by intentionally or knowingly using or displaying a deadly weapon is a "nature of conduct" offense, which "focuses on the defendant's conduct of using or displaying a weapon, rather than the result from that conduct").

Viewed in the light most favorable to the State, the evidence at trial established that Javaris was standing in front of Perkins Grocery Store when he saw the Defendant running towards him while firing a gun. Javaris testified that although he did not hear any bullets pass by his head, he saw the Defendant aim the gun at him and pull the trigger. Likewise, Chris testified that the Defendant pointed the gun at him and pulled the trigger, but the gun's clip was empty. At the scene, police officers observed a car that had been damaged by gunfire and collected more than 14 shell casings all matching a single weapon. Moreover and contrary to the Defendant's assertions, Javaris testified that Ms. Nichols was present with him in front of Perkins Grocery Store when the Defendant began shooting and that he helped her and her sister escape by climbing over a gate because he feared for their safety. The jury obviously accredited this testimony, as was their prerogative. Based upon this evidence, a rational juror could find beyond a reasonable doubt that the Defendant was aware that his conduct was reasonably certain to cause all three victims to reasonably fear imminent bodily injury. See State v. Joseph H. Adkins, No. E2012-02415-CCA-R3-CD, 2014 WL 1516331, at *13 (Tenn. Crim. App. April 17, 2014) (noting that the aggravated assault statute "only requires that the gun be displayed to the victim and not directly pointed at the victim") (internal quotation marks and citations omitted); cf. State v. Wilson, 924 S.W.2d 648 (Tenn. 1996) (concluding that the evidence was insufficient to sustain the defendant's aggravated assault conviction where the defendant fired into a house without knowing whether anyone was inside).

**B. Reckless endangerment with deadly weapon.** The Defendant argues that the evidence is insufficient to sustain his conviction for felony reckless endangerment against Anterrica Stokes. He notes that Ms. Stokes did not testify at trial, and the only proof that she was present at the scene was presented through the testimony of Javaris Cole. Accordingly, he maintains that the State failed to prove that Ms. Stokes was placed in imminent danger of death or serious bodily injury by the Defendant.

Reckless endangerment is committed when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a) (2012). When committed with a deadly weapon, reckless endangerment is a Class E felony. Id. § 39-13-103(b)(2). In order for the threat of death or

serious bodily injury to be imminent, "the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999). The "zone of danger" is "that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id. Thus, the State must prove that "a person or class of person were in an area in which a reasonable probability of danger existed." Id.

This court has previously recognized that "[m]erely discharging a gun, standing alone, is not sufficient to constitute commission of reckless endangerment." State v. Fox, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996) (internal quotation marks and citations omitted). It is not enough to show that the defendant discharged a weapon "under any circumstances where any human being might possibly be present or where a stray bullet might possibly strike another person." Id. (quoting State v. Michael David Culbertson, No. 03C01-9412-CR-00449, 1995 WL 512077, at *2 (Tenn. Crim. App. Aug. 30, 1995) (emphasis in Michael David Culbertson)). Rather, the Defendant's conduct must "place another person in imminent danger of death or serious bodily injury." State v. Alder, 71 S.W.3d 299, 304 (Tenn. Crim. App. 2001).

In the instant case, the Defendant argues that the proof at trial showed that Ms. Stokes "might have heard or seen the shooter firing into the air," but there was no evidence that she was placed in imminent danger of death or serious bodily injury. We disagree. Viewed in the light most favorable to the State, the proof at trial showed that the Defendant fired at least 14 shots in the area of Perkins Grocery Store where Ms. Stokes was present. Javaris testified that he was standing with Chris, Ms. Nichols, and Ms. Stokes when he saw the Defendant point the gun at him and pull the trigger. He further testified that he, Ms. Nichols, and Ms. Stokes fled behind the store where he helped them climb over a gate to escape the gunfire because he feared for their safety. Based on this testimony, a rational juror could have concluded beyond a reasonable doubt that Ms. Stokes was placed within the "zone of danger" created by the Defendant's conduct and was in imminent danger of death or serious bodily injury. Compare Alder, 71 S.W.3d at 304 (concluding that proof that victim was standing next to individual that was shot and was in the defendant's line of fire was sufficient to prove that the victim was in imminent danger of death or serious bodily injury) with State v. Thomas R. Baldwin, No. 01C01-9612-CR-00530, 1998 WL 426199, at *3 (Tenn. Crim. App. July 29, 1998) (concluding that "mere speculation" that a bullet could have ricocheted off an appliance in a small restaurant and hit a customer was insufficient to prove that the customer was in imminent danger of death or serious bodily injury). The Defendant is not entitled to relief on this issue.

**II. Sentencing.** The Defendant argues that the trial court abused its discretion in imposing consecutive sentencing based upon the trial court's finding that the Defendant has an extensive criminal record and is a dangerous offender. He asserts that the court's determination regarding his criminal record was "based almost exclusively on the [D]efendant's juvenile history" and many of his charges were dismissed; thus, he maintains that his criminal record is "not so extensive that it justifies the imposition of a twenty[-]year sentence for a nineteen[-]year[-]old man." He also argues that the court improperly concluded that he is a dangerous offender based on the nature and circumstances of the offenses involved.

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a) (2006). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

"The existence of a single category is sufficient to warrant the imposition of consecutive sentences, and indeed, '[e]xtensive criminal history alone will support consecutive sentencing.'" State v. Gann, 251 S.W.3d 446, 464 (Tenn. Crim. App. 2007) (citing and quoting State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (alteration in Gann)). Where the court imposes consecutive sentencing based upon the dangerous offender category, the trial court must also conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Pollard, 432 S.W.3d at 863 (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)).

In the case sub judice, the trial court imposed consecutive sentencing based upon its finding that the Defendant has an extensive criminal record and is a dangerous offender. See T.C.A. § 40-35-115(b)(2), (4). In reaching its determination, the court stated:

> As far as the issue of consecutive sentencing, I do find the [D]efendant is qualified because he is an offender whose record of criminal activity is extensive. Now, that's hard to say about a 19-year old individual.
>
> You have to keep in mind the primary purpose of consecutive sentencing for those offenders whose record is extensive is to protect the public from an individual not likely to be rehabilitated. A defendant's record of criminal activity includes not only the defendant's prior record, but also the convictions for which [he] is currently being sentenced. . . . Likewise, juvenile adjudication may be considered in assessing the defendant's criminal activity. [The Defendant] has 24 contacts with the juvenile system, two of which involve weapons. I've already mentioned the adjudications for felonies that he has.
>
> . . . .
>
> And I just think it all adds up to a record of criminal activity that is

extensive and I do think he's not likely to be rehabilitated. I mean, 25 times. I mean, . . . they tried everything they could at juvenile court for this fellow.

I also find the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing the crime in which the risk to human life is high. I do find the circumstances of the offense were aggravated. You know, he got up here and testified that he – you know, I don't know how you say it. In the street wise lingo of the gang bang, got up here and just decided to unload at least 14 rounds at this – at this group of people. I think that's more than just an aggravated assault. That's showing total indifference.

I also find that confinement for an extended period of time is necessary to protect society from the [D]efendant's unwillingness to lead a productive life and I find the aggregate length of the sentences that I'm going to impose reasonably relate to the offense for which the [D]efendant stands convicted.

. . . . [The Defendant] is a menace to society and we need protecting from this individual.

The Defendant argues that the trial court placed too much weight on his juvenile record and asserts that his criminal history is "not so extensive" that it justifies consecutive sentencing. Initially, we are compelled to note that "[i]n making the determination to impose consecutive sentencing the court is not limited to consideration of criminal activity or conduct occurring after one reaches the age of eighteen (18) years." State v. Stockton, 733 S.W.2d 111, 112 (Tenn. Crim. App. 1986). "It would serve neither the interests of society, nor the protect the public from further criminal conduct by the defendant, to wipe the slate clean and deny the sentencing authority the benefit of a defendant's past history of criminal activity, in assessing his sentence, simply because some part of that history occurred during his juvenile years." Id. Although the nineteen-year-old Defendant's criminal record consists almost entirely of juvenile offenses, it is indeed extensive. The Defendant's presentence report reflects at least 20 juvenile offenses beginning in 2005 and continuing through the Defendant's eighteenth birthday in March 2012. We acknowledge that some of these offenses were dismissed; notwithstanding, his record of criminal activity remains extensive and includes, inter alia, adjudications for assault, theft of property, unlawful possession of a weapon, and aggravated burglary. Thus, the record fully supports the trial court's finding that the Defendant's criminal activity is extensive.

The Defendant also argues that the trial court improperly concluded that he is a dangerous offender whose behavior indicates little or no regard to human life. At the outset,

we must note that the trial court's finding that the Defendant's criminal history is extensive is alone sufficient to impose consecutive sentencing. See Adams, 973 S.W.2d at 231. Notwithstanding, our review of the record shows that the trial court also made the additional factual findings as required to determine that the Defendant is a dangerous offender. The court emphasized the serious nature of the offenses involved, highlighting that the Defendant fired at least 14 shots at the victims in this case.[2] The court stated on the record that it found consecutive sentencing was warranted to "protect society from the [D]efendant's unwillingness to lead a productive life" and that the aggregate length of the sentence "reasonably relate[s] to the offense for which the [D]efendant stands convicted." Cf. Wilkerson, 905 S.W.2d at 938 (holding that the trial court's conclusory statement that "the proof in the record indicates . . . [the defendant] is a dangerous . . . offender, and there was little or no regard for the value of human life" was insufficient to impose consecutive sentencing). Accordingly, we discern no abuse of discretion by the trial court in ordering the Defendant to serve his sentences consecutively.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE

---

[2] In his brief to this court, the Defendant argues that the trial court considered evidence outside of the record, calling attention to the following statement made by the trial court at the sentencing hearing: "In the street wise lingo of the gang bang, [the Defendant] got up here and just decided to unload at least 14 rounds at this – at this group of people." The Defendant argues that the trial court abused its discretion because there was no proof presented that the Defendant is or has ever been in a gang. However, when read in context, it is clear that the trial court's statement was highlighting the serious nature of the offenses and the fact that the Defendant fired at least 14 shots at the victims, which the court found to show a "total indifference" to human life. Contrary to the Defendant's assertions, there is no indication that the court considered whether the Defendant was involved in a gang when making its sentencing determination.